UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES C. PACENZA, SR.,

                             Plaintiff,

          - against -

IBM CORPORATION,

                             Defendant.

**ECF CASE**

04 Civ. 5831 (PGG)

<u>MEMORANDUM AND ORDER</u>

PAUL G. GARDEPHE, U.S.D.J.:

          Before the Court is Defendant IBM Corporation's motion for summary

judgment and Plaintiff James C. Pacenza, Sr.'s cross-motion for partial summary

judgment.  For the reasons explained below, IBM's motion is GRANTED and Pacenza's

motion is DENIED.

**I.      <u>Procedural History</u>**

          Pacenza's Complaint alleges that IBM discriminated against him because

of his alleged disability – post-traumatic stress disorder ("PTSD") – and his age, and

asserts claims under (1) the Americans with Disabilities Act of 1990 ("ADA"); (2) the

Age Discrimination in Employment Act of 1967 ("ADEA"); and (3) the New York State

Human Rights Law ("NYSHRL").[1]

          IBM moved for summary judgment on December 1, 2006, and Pacenza

cross-moved for partial summary judgment on January 19, 2007.  On February 16, 2007,

IBM filed a motion to strike portions of Pacenza's motion papers, and on March 2, 2007,

---

[1]  Pacenza stipulated to the withdrawal of his ERISA claim in November 2006.  (Order
dated November 30, 2006, Docket No. 16)

Pacenza filed a counter-motion requesting that the Court strike portions of IBM's papers. In an order dated July 26, 2007, the Court denied Pacenza's motion but partially granted IBM's motion, ruling that much of Pacenza's Rule 56.1 Statement and Counter-Statement contained "impermissible argument" and "conclusory allegations."  (Order dated July 26, 2007, Docket No. 35)

This action was reassigned to this Court on November 17, 2008.

## II.     __Background__

On May 29, 2003, IBM fired Pacenza – then fifty-four years old – after nineteen years of employment, contending that he had violated IBM policies by accessing sexually oriented chat room sites on the internet.  Pacenza alleges that IBM terminated his employment because of his disability – PTSD – and his age.  Pacenza further claims that his PTSD manifests itself through a variety of addictive behavior – including an addiction to sexually oriented material on the internet.  Despite this addiction, Pacenza maintains that he was an exemplary IBM employee, and that IBM used his improper internet usage as a pretext to justify his termination and disguise its disability and age discrimination.

IBM alleges that it warned Pacenza in January 2003 about his inappropriate internet use, and that its termination of his employment in May 2003 was provoked by his decision to access an inappropriate chat room internet site on his work computer despite this prior warning, and was entirely unrelated to his alleged disability or age.  IBM further alleges that Pacenza's conduct violated several written and widely disseminated Company policies and that it has fired other employees for similar internet

misuse.  Finally, IBM maintains that the employees involved in the decision to fire

Pacenza had no knowledge of his PTSD when they decided to terminate his employment.

> ### A.   <u>Pacenza's Disability</u>

Pacenza suffers from PTSD, which he alleges stems from his service in

Vietnam and sexual abuse he suffered as a child.  (Pacenza Decl. ¶ ¶ 6, 44)[2]  Pacenza

claims that he developed addictive tendencies as a result of his PTSD including

alcoholism, food addiction, and, most recently, sex addiction.  (<u>Id.</u>, ¶ 46)

Pacenza began attending therapy for his sex addiction in 1994 or 1995,

and attended Sex Anonymous, Sex and Alcoholics Anonymous, and Sex Acts

Anonymous meetings during this period.  (Pacenza Dep. at 62:16-19)  In 1997 and 1998,

he was twice hospitalized for his suicidal urges.  (Pacenza Decl. ¶ ¶ 73, 74, 77, 78)  He

took a 55-day leave from IBM in 1997 and a 30-day leave in 1998 to receive in-patient

psychiatric treatment.  (<u>Id.</u>, ¶ ¶ 73, 74, 78)  Following his 1998 in-patient treatment,

Pacenza lived at a halfway house for approximately a year.  (<u>Id.</u>, ¶ ¶ 78, 81)  In 1999,

Pacenza began psychotherapy with John DeRosalia, who continued to treat Pacenza until

2004.  (<u>Id.</u>, ¶ ¶ 82, 83)  IBM's health care plan has funded all of Pacenza's in-patient

treatment and psychotherapy.  (<u>Id.</u>, ¶ ¶ 76, 82)  While his PTSD has allegedly led to a

variety of addictive tendencies, Pacenza claims that it has never had any effect on the

performance of his duties at IBM.  (<u>Id.</u>, ¶ ¶ 53, 54, 55, 63, 64, 65)

---

[2]  The facts discussed in this opinion are drawn from:  Pacenza's Declaration and Rule
56.1 Statement and Counter-Statement; deposition testimony Pacenza offered in support
of his motion and in opposition to IBM's motion; IBM internal documents and policies,
the contents of which Pacenza does not dispute; and portions of IBM's Rule 56.1
Statement that Pacenza does not dispute, does not challenge with admissible evidence, or
cannot challenge, because his corresponding Rule 56.1 submission was stricken by the
Court.

**B.**     **Pacenza's Employment History at IBM**

Pacenza began work at IBM's Fishkill, New York facility on January 22, 1984.  (IBM R. 56.1 Statement, ¶ 1)  Throughout his employment at IBM, Pacenza received positive evaluations from his supervisors.  (Pacenza Decl. ¶ 55)

In 1996, IBM transferred Pacenza to its Advanced Semiconductor Technology Center, where he was involved in the manufacture of computer chips. Pacenza worked a twelve hour alternate work schedule.[3]  (IBM R. 56.1 Statement, ¶ 1; Pacenza Decl., ¶ 79)  Pacenza operated an Opal Questar Machine ("Tool") which he used to measure the thickness of silicon wafers.  (IBM R. 56.1 Statement, ¶ 2)  The Tool identified flawed wafers and halted the manufacturing process to correct problems.  (Id.) The Tool measured wafers for five to ten minutes; during this time, Pacenza had no direct role in the process.  (Id.)  Pacenza used an IBM computer with internet access to operate the Tool.  (Id.)

Pacenza alleges that he accessed the internet during the Tool's downtime to avoid negative thoughts (Pacenza Decl., ¶ 91), and because it helped him "to perform repetitive, assembly-line type computer chip inspection work proficiently and efficiently, on a daily basis."  (Id., ¶ 67)  Pacenza maintains that he never viewed "sexually graphic pictures" over the internet at work.  (Id., ¶ ¶ 97, 98)

**C.**     **IBM's Internet Use Policies**

IBM has several policies which regulate its employees' use of the internet at work and general conduct in the workplace.  The "Use of IBM Assets" policy

---

[3] When Pacenza returned to IBM after his 1999 in-patient treatment, IBM initially allowed him to work eight-hour shifts.  (Pacenza Decl. ¶ 79)

authorizes IBM employees to "use IBM systems for direct business purposes as well as for general information of personal interest."  (Affidavit of Kevin G. Lauri dated Dec. 7, 2006, Ex. E) ("Lauri Aff.")  This policy also states, however, that "such personal use must not interfere with employee productivity."  (Id.)  "Of particular concern is the use of IBM assets to access sites others are likely to find offensive such as Web sites with sexually explicit content. . . ."  (Id.)

    IBM's harassment policy states that "IBM is committed to provide a work environment free from sexual harassment or any other harassment. . . ." (id., Ex. F), and that "[a]nyone can, by subjecting someone else to a hostile work environment, engage in harassment."  (Id.)  "A hostile work environment can be created by such things as jokes, offensive materials. . . .."  (Id.)  "What must be understood is that IBM prohibits in its work environment not only harassment but also inappropriate conduct, even if the person to whom it is directed welcomes it."  (Id.)  The policy also explains that "[v]erbal comments or physical actions of a sexual nature – including . . . the display of sexually explicit or suggestive material – may or may not constitute sexual harassment when unwelcome, but are unacceptable in a work-related environment whether welcome or unwelcome."  (Id.)  In addition, the policy states that "[v]ulgar language . . . as well as photographs, pictures, or printed material which others might find offensive or degrading" are unacceptable.  (Id.)  The policy further states that IBM "has a zero tolerance level for such conduct in the work environment."  (Id.)

    Portions of IBM's Business Conduct Guidelines ("BCGs") also discuss appropriate behavior at work.  Section 3.2, entitled "Personal Conduct," explains that "[i]f IBM management finds that your conduct on or off the job adversely affects your

performance, that of other employees, or IBM's legitimate business interests, you will be subject to disciplinary measures, including dismissal."  (Id., Ex. G)  Section 3.3., entitled "Work Environment," explains that "IBM will not tolerate sexual advances, actions or comments or racial or religious slurs, jokes or any other comments or conduct in the workplace that creates, encourages or permits an offensive, intimidating or inappropriate work environment."  (Id.)

Pacenza attended sexual harassment training at IBM on July 21, 2002, and reviewed the BCGs in January 2003.  (Id., Exs. H, I)

**D.     IBM Warns Pacenza About His Internet Use**

In either late 2002 or early 2003,[4] Joseph Mihans, Pacenza's direct supervisor, warned Pacenza about his improper internet use.  Steve Notollo, one of Pacenza's co-workers, had observed Pacenza visiting inappropriate internet sites while operating the Tool.  (IBM R. 56.1 Statements, ¶ 11)  Notollo described the internet material as "graphic" and "pornographic in nature," and expressed concern that other employees might be offended by what Pacenza was looking at or discussing online.  (Id.)

Mihans then spoke with Pacenza about Notollo's allegations.  Pacenza described their conversation as follows:

> . . . he said to me well, somebody saw you on the Internet, and you went somewhere you shouldn't have been, and I just want to let you know you got to watch yourself because people are seeing you.  So be careful, and I said – that is when I told him, well, Joe[,] I have a problem with the Internet.  I have had a problem for a long time, and I am getting help.  I go to a therapist, and I go to meetings.  Don't worry.  I won't do it again, and

---

[4] Pacenza alleges that this conversation took place during the hunting season of 2002. (Pacenza Dep. at 55:6-8)  IBM alleges that this conversation took place in January 2003. (IBM R. 56.1 Statement, ¶ 11)  The exact date of this conversation is not a material fact for purposes of resolving the instant motions.

that was about all that was said.  He didn't say anything about talking to
Carla [Meigel, Mihans' supervisor] or next time you are going to get fired
or anything.  It was nothing like that, and it scared the hell out of me.
(Pacenza Dep. at 56:2-20)

Pacenza testified that during this conversation he told Mihans he had a

"long-standing Internet sexual addiction."  (Pacenza Decl., ¶ 160)  Although Pacenza

states that he did not tell Mihans what websites he had been visiting, Pacenza admits that

he had visited internet chat rooms at work prior to Mihans's warning.  (Pacenza Dep. at

56:25-57:3)

Mihans testified that he told Pacenza that "we do not look at anything that

could be considered offensive on the internet."  (Mihans Dep. at 15:19-21)  Mihans

testified that Pacenza "was very emotional because he knew that his job was on the line"

(id. at 16:24-25), and "was swearing up and down that it would never happen again, that

he will never do it again."  (Id. at 17:4-6)  Moreover, Mihans testified that Pacenza told

him that he had a problem with the internet:

> [I]t was one point during this time he broke down and told me that he has
> got problems with pornography and that he was afraid to go home because
> if he went home and his wife knew that he was in potential trouble
> because of something like this he was afraid that his wife would leave
> him.  And I offered help through IBM and that's when he told me he is
> getting help and that he is okay with what – he is good with what he has.
> (Id. at 18:18-19:2)

### E.      IBM's Treatment of Other Employees
###         Who Violated Its Internet Policy

Both Pacenza and Mihans testified that they were aware that IBM had

fired other employees for viewing pornography at work (Pacenza Dep. at 131:14-20;

Mihans Dep. at 27:22-25), and IBM has offered undisputed evidence that it "has

consistently disciplined its employees at the Fishkill site where Plaintiff was employed

for using its systems for viewing or sending improper sexually themed material."  (IBM R. 56.1 Statement, ¶ 54)  IBM offered evidence that four employees had been fired for such conduct, which included sending sexually explicit messages over the internet. (Lauri Aff., Exs. Z, AA; IBM R. 56.1 Statement, ¶¶ 56-57)  While Pacenza alleges that IBM did not immediately terminate an employee who used his IBM computer to view child pornography (Pacenza Br. at 2), the record indicates that IBM worked with the local police for several months to gather information that eventually led to the employee's arrest.  (Pacenza Ex. 18)  After his arrest, IBM fired the employee.  (Id.)

**F.      Termination of Pacenza's Employment**

**1.      Pacenza Accesses a Sexually Oriented Chat Room**

On May 28, 2003, while operating the Tool, Pacenza visited an internet chat room.  (Pacenza Decl. ¶ ¶ 113, 114, 115, 116, 117)  Pacenza explained that he "entered a chat room through www.ChatAvenue.com, and [he] sought to engage in 'adult conversation' and perhaps even find someone willing to engage [him] in talk about human relations."  (Id., ¶ 116)  Pacenza was "tempting himself to perhaps become involved in some titillating conversation."  (Id.)

Pacenza testified:

> [A]t the same time I was – I was on the chat room, and I had just – just begun a chat, and I was called away from the tool to go to another tool on the next aisle to let somebody go to lunch, and normally I would just log off the Internet, but I knew I was going to be coming right back, so I left it.  I toggled over, so that the Opal screen was there.  So I went to the other tool and when I came back and toggled the Internet was gone.  So I just assumed somebody just logged it off.  (Pacenza Dep. at 64:24-65:12)

When Pacenza left to operate another Tool, Pacenza's team leader, Steve Questal, assumed Pacenza's place at his Tool.  (IBM 56.1 Statement, ¶ 17)  After Questal

toggled the computer screen, he saw the chat room, which discussed giving "blow jobs" and "performing other sexual acts."  (Id., ¶ 18)  Questal described the chat room as "pornographic" and "sexual in nature."  (Id.)  Questal showed the chat room to one of Pacenza's co-workers, Robert Sturrock. (Id., ¶ 19)  Sturrock testified that the chat room contained "some sexual discussion" with "sexual content" and "sexual innuendos."  (Id.) Questal reported Pacenza's chat room use to Mihans.  (Id., ¶ 21)

Mihans called Pacenza into his office at the end of the day.  (Pacenza Dep. 65:12-13)  Pacenza described the meeting as follows:

> And on my way out going home that night just before that, Joe [Mihans] called me into his office and said that Steve Questal had found the Internet on the computer, and that there was pornography on it, and I said well, Joe, I don't look at pornography.  So it is wrong, and it is – you must be wrong, and he said no, it was – the word blow job was on the screen, and that is pornography, and I said, well, I don't look at pornography, and I hadn't seen the word blow job.  So I didn't even know what he was talking about because when I left the screen, there was nothing on there.  I had just started, and he said well, this is very serious, and he said something about getting me some help.  So I left.  (Id. at 65:12-66:5)

Pacenza maintains that he "did not view pornography at work, but [he] admit[s] that [he] had visited a chat room."[5]  (Pacenza Decl., ¶ 118)

Mihans's notes of his May 28, 2003 meeting with Pacenza largely track Pacenza's recollection.  Mihans wrote that he asked Pacenza if he was "looking at pornography on the web," and Pacenza said he was not.  (Pacenza Ex. 5)  Mihans told

---

[5]  The parties use "pornography" to connote different media.  Pacenza understands "pornography" to only encompass pornographic images, and states that the chat room contained "merely vulgar words," and not "sexually explicit photographs commonly referred to as 'Internet porn.'"  (Pacenza Br. at 5)  IBM attributes a broader meaning to this term, which includes language as well as visual images.  (IBM Br. at 20)  The meaning of "pornography" is not a material fact for the resolution of these motions, because the critical issue is whether Pacenza's conduct – however categorized – violated IBM's policies.

Pacenza that he "felt that chat rooms with discussions of blowjobs is pornographic in nature," and stated that he had "talked to [Pacenza] before regarding this type of behavior and that [he would] need to discuss the situation with [his] mgr and HR."  Mihans also wrote that he asked Pacenza whether he was "getting therapy with this and if he needed more help."  Pacenza replied that he still worked with a therapist.  (Id.)

### 2.    Mihans Consults the Human Resources Department

That day or the next day, May 29, 2003, Mihans consulted his supervisor, Carla Meigel, and his human resources contact, Trilby Sieverding, about how to respond to Pacenza's second violation of IBM's internet usage policy.  (IBM R. 56.1 Statement, ¶ 24)  Mihans described the prior warning he had given to Pacenza (Pacenza Ex. 9), and told Sieverding that Pacenza had confided that he liked to access chat rooms with sexual content.  (Id.)  Mihans also described Pacenza's most recent chat room incident, explaining that it involved a chat room where the subject was oral sex.  (Id.)  Sieverding told Mihans that "other employees . . . who had engaged in similar inappropriate conduct – accessing and viewing sexually offensive or pornographic material on the internet – had been discharged by IBM."  (IBM R. 56.1 Statement, ¶ 24)

Sieverding interviewed two of Pacenza's co-workers about his internet usage.  One co-worker, Brenda McKnight, stated that Pacenza was "constantly on the internet, and it was not related to his job."  (Pacenza Ex. 9)  Sieverding also spoke with Pacenza's team leader, Steve Questal, who told Sieverding that "two chat rooms were open, there were no pictures, just text."  (Id.)  Questal also said that "[h]e knew immediately that they were sex related due to the names of the people signing in, for

example Virgin1." (Id.)  According to Questal, the chat rooms "consisted of banter back and forth, and described what they would do to each other sexually if they could." (Id.)

Sieverding also spoke with Al Pflunger of IBM's Medical Department. (Id.)  Pflunger told Sieverding that "Pacenza was treated in 1998 for a sexual disorder/psychiatric problems, and that therapy was indicated," but that there were no restrictions on Pacenza's work assignments. (Id.)

After speaking with Meigel and Sieverding, Mihans decided to terminate Pacenza because "of his inappropriate behavior of engaging in a chat room discussion of sexual content while at work, which violated IBM's BCGs, internet usage and harassment policies." (IBM R.56.1 Statement, ¶ 25)  Mihans testified that although he discussed the matter with Meigel and Sieverding, it was his decision to fire Pacenza, and that he fired him because of his "use on the Internet and looking at offensive material on it." (Mihans Dep. at 23:6-9, 40:2-3)

### 3.    Pacenza's May 29, 2003 Termination

Pacenza reported to work the next day, May 29, 2003.  At the end of the day, Mihans again called Pacenza into his office. (Pacenza Decl., ¶ 119)  Pacenza explained that Mihans

> said that I was fired because it was pornography, and that Carla [Meigel] said that other people have been fired for less than that, and I asked him how come – where was the help you told me last night that you were going to get me, and he said my hands were tied.  I couldn't do anything, and he asked, and he escorted me from the building. (Pacenza Dep. at 66:18-67:2)

Although Mihans was responsible for firing him, Pacenza described Mihans as his friend and testified that he did not believe that Mihans had discriminated

11

against him because of his disability.  (Pacenza Dep. at 54:12-14, 80:14-17)  Pacenza also

testified that Meigel never did anything to make Pacenza believe she was discriminating

against him on the basis of his disability – other than his termination.  (Id. at 80:23-81:20)

Finally, Pacenza admitted that no one at IBM, including Mihans and Meigel, ever took

any actions or did anything to make Pacenza believe that they wanted to fire Pacenza

because of his age.  (Id. at 93:13-94:8)

> ### G.    IBM's Knowledge that Pacenza Suffered From PTSD

When questioned at this deposition as to whether he ever told Mihans or

Meigel about his PTSD, Pacenza explained:  "Not in so many words.  It is not something

that you go tell people – you don't tell people that. . . ." (Id. at 76:14-24)  Pacenza further

testified that he never asked anyone at IBM for help with his PTSD and did not identify

his disability at the time of his termination.  (Id. at 76:14-25, 135:3-11; IBM R. 56.1

Statement, ¶ 48)  Mihans likewise testified that had no knowledge of Pacenza's PTSD at

the time he terminated Pacenza's employment.  Mihans explained that he knew Pacenza

had "problems with pornography," but he did not know that Pacenza's problems had

anything to do with Vietnam.[6]  (Mihans Dep. at 8:15-21)

> ### H.    Aftermath of Pacenza's Termination

>> #### 1.    Pacenza's Position

IBM did not replace Pacenza with a new employee but simply

assigned his duties to other Tool operators.  (IBM 56.1 Statement, ¶ 29; Pacenza Decl., ¶

156)  Pacenza alleges, however, that his much younger co-workers and temporary

---

[6]  Five or six years earlier, when Pacenza was hospitalized in 1997 and 1998, he told his
previous manager, Jeff Siple, about his PTSD.  (Pacenza Decl., ¶ 76)  There is no
evidence that Siple shared this information with anyone at IBM.

employees took over his position.  (Pacenza Decl., ¶ 157)  Pacenza also alleges that,

except for Robert Sturrock, he was the oldest person in his department.  (<u>Id.</u>)  IBM

alleges that the group of workers who took over Pacenza's job included people who were

in the same age bracket as Pacenza.  (IBM 56.1 Statement, ¶ 29)

### 2.   <u>Pacenza's Internal Appeal</u>

IBM provides an internal appeal program for certain terminated

employees.  (Pacenza Ex. 11)  Under this program, Pacenza alleges that he was eligible

for a "panel review," which "decide[s] appeals involving how the interpretation and/or

application of specific company policies, procedures, or established practices affects

employees."  (<u>Id.</u>)  The purpose of the panel review is to determine "whether the

employee was treated fairly."  (<u>Id.</u>)  A panel "cannot accept situations over which it has

no jurisdiction, [however,] such as setting or changing company policy."  (<u>Id.</u>)  Issues

eligible for appeal include discrimination and unfair treatment, while ineligible issues

include harassment and layoffs.  (<u>Id.</u>)

Pacenza spoke to Lynea St. Pier of IBM's Human Resources Department

about an appeal.  His notes of their conversation indicate that he told her that he was in a

chat room on the day of his termination.  (<u>Lauri Aff., Ex. Q</u>)  St. Pier's notes, dated June

3, 2003, state that Pacenza "doesn't deny what he did – says he wasn't given a second

chance – that other addicts would have gotten."  (Lauri Aff., Ex. R)  St. Pier's notes state

that Pacenza "is a sex addict," and that Pacenza's "Mgr. had prior awareness of

condition."  (<u>Id.</u>)  St. Pier told Pacenza that he had no basis for an appeal because he had

violated company policy.  (Lauri Aff., Ex. Q)

Pacenza then called Phyllis Helms in corporate appeals.  (Id.)  Helms's memo indicates that she asked Pacenza why IBM fired him and Pacenza replied that "it was because he was logged onto a chat room while at work."  (Lauri Aff., Ex. T)  Pacenza also admitted that IBM had terminated his employment for a BCG issue.  (Id.)  Helms's memo states that Pacenza told her that he was a sex addict, and that "his manager first told him he'd try to get him some help but then after checking with HR, his manager told him he was being terminated."  (Id.)

After Pacenza spoke with Helms, he was contacted by another IBM employee, Michelle Geiger, who informed him that there was "no basis for appeal." (Lauri Aff., Ex. Q)  Pacenza complained that he was being treated more harshly because he was a sex addict, rather than a drug addict or alcoholic.  (Id.)

### 3.  Pacenza's Statements to Therapists

Pacenza told several therapists about the basis for his termination.  For example, he told DeRosalia "that he was in a chat room for a sexual experience" on the day that he was fired.  (DeRosalia Dep. at 51:25-52:2)  Pacenza's medical records state that he:  (1) "was fired from his job at IBM because he was doing cyber sex on the computer;" (2) "was fired from a job of 19 years because he was visiting porn sites on the Internet;" and (3) "was fired several years ago from a 19 year job for visiting Internet pornography sites while at work." [7]  (Lauri Aff., Exs. V, W, X)

---

[7]  Although Pacenza argues that his statements to his therapists are inadmissible hearsay (Pacenza Br. at 33), they appear to constitute statements made for the purpose of medical diagnosis or treatment and are thus admissible under Fed. R. Evid. 803(4).  Additionally, Pacenza's statements are admissible as party-opponent admissions under Fed. R. Evid. 801(d)(2).

## DISCUSSION

IBM argues that its motion for summary judgment should be granted because (1) Pacenza has failed to make out a <u>prima</u> <u>facie</u> case under either the ADA or the ADEA; and (2) even if Pacenza had established a <u>prima</u> <u>facie</u> case, he has not established that IBM's proffered reason for his discharge was a pretext.

Pacenza argues that his cross-motion for summary judgment should be granted because he offered undisputed evidence to:  (1) make out a <u>prima</u> <u>facie</u> case under both the ADA and ADEA; and (2) establish that the reason IBM gave for his termination – improper internet use – was a pretext.  In the alternative, Pacenza argues that IBM had a mixed-motive for his termination – <u>i.e.</u>, Pacenza's PTSD was a motivating factor behind his termination even if it was not the sole reason that IBM fired him.  Pacenza also alleges that IBM did not reasonably accommodate his disability as the ADA requires.[8]

With respect to his ADA claims, Pacenza has failed to establish a <u>prima</u> <u>facie</u> case, because the undisputed evidence demonstrates that those involved in the termination decision at IBM did not know that Pacenza suffered from PTSD.  Indeed, Pacenza testified that he did not believe that Mihans – the decision maker – had discriminated against him because of his disability.  (Pacenza Dep. at 54:12-14, 80:14-17)  Pacenza has also not established that IBM's proffered reason for his termination was a pretext because:  (1) IBM's policies prohibited the internet use that Pacenza engaged in

---

[8]  This Court's consideration of Pacenza's motion and opposition has been significantly hampered by the improper nature of his supporting papers.  His Rule 56.1 Statement and Counter-Statement, for example, contains – as Judge Robinson found – substantial legal argument and conclusory allegations.  The factual allegations that remain, after the motion to strike was partially granted, are often not supported by citations to the record.

and that prompted his termination; and (2) IBM has submitted undisputed evidence that it fired other employees who violated its internet policy in a similar fashion.

Pacenza has likewise not presented enough evidence of discriminatory intent to cause the evidentiary burden to shift to IBM under a mixed-motive analysis. Finally, the Court holds that IBM did not fail to reasonably accommodate Pacenza's PTSD, because Pacenza never informed IBM that he suffered from PTSD, and even if Pacenza had given IBM such notice, it is undisputed that Pacenza's PTSD did not prevent him from performing the essential functions of his job.

With respect to his age discrimination claim, although Pacenza has established a prima facie case under the ADEA, he has not shown that IBM's proffered reason for his termination was a pretext, nor has he offered any credible evidence that age was the true reason for his termination.

## I.      Standard of Review

Summary judgment is warranted if the moving party shows that "there is no genuine issue as to any material fact" and that it "is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor," Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008), and the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

"It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," and that "the salutary purposes of

summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001).  As in any other case, "an employment discrimination plaintiff faced with a properly supported summary judgment motion must 'do more than simply show that there is some metaphysical doubt as to the material facts'. . . . She must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

The Court is mindful that "direct evidence of . . . [discriminatory] intent will only rarely be available, . . . [so] 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008).  However, the Court must also "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999).

This Court will analyze Pacenza's federal and state law disability and age claims together, because they are governed by the same legal framework.  See Rodal v. Anesthesia Group of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims.");[9] Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115 n.3 (2d Cir.

---

[9]  Although the ADA and NYSHRL use different definitions of disability, see Ferraro v. Kellwood Co., No. 03 Civ. 8492, 2004 WL 2646619, at *5 n.10 (S.D.N.Y. Nov. 18, 2004), this distinction is not significant here because this Court assumes – for purposes of the instant motions – that Pacenza is disabled within the meaning of both statutes.

2007) ("[A]ge-discrimination claims under the ADEA, NYSHRL, and NYCHRL are analyzed under the same standard.")

## II.     Pacenza's ADA Claims

### A.     ADA Legal Framework[10]

"ADA employment discrimination claims are subject to the familiar burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green."  Sista v CDC Ixis N. Am., Inc. 445 F.3d 161, 169 (2d Cir. 2006).  In other words, under the McDonnell Douglas framework, a "plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext."  Id. (citation omitted)  "Despite the initial evidentiary burden shifting, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 307 (S.D.N.Y. 2000) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).

#### 1.     Prima Facie Case

"The ADA prohibits discrimination against any qualified individual with a disability because of the disability of such individual in regard to, inter alia, discharge from employment."  Sista, 445 F.3d at 169 (quotation omitted).  To establish a prima

---

[10]   The ADA was amended effective January 1, 2009 ("ADA Amendments").  See ADA Amendments Act of 2008, Pub.L. 110-325, 122 Stat. 3553 (2008).  The Court reaches the same result under the ADA, whether or not the ADA Amendments are considered.

facie case of disability discrimination under the ADA, a plaintiff must show that "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA;[11] (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Id.; see also Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004).

## 2.      Pacenza Has Not Established a Prima Facie Case

Pacenza has not established a prima facie case of disability discrimination here, because, under the fourth prima facie factor, he has not demonstrated that his employer – specifically, the supervisor who decided to terminate his employment – was aware of his alleged PTSD disability.  Absent such proof, a plaintiff cannot meet his burden of demonstrating causation, because "if [an employer] were truly unaware that . . . a disability existed, it would be impossible for [an] [employment] decision to have been based, even in part, on respondent's disability."  Raytheon Co. v. Hernandez, 540 U.S. 44, 55 n.7 (2003); see also Woolley v. Broadview Networks, Inc., No. 01 Civ. 2526, 2003 WL 554754, at *8 (S.D.N.Y. Feb. 26, 2003) (finding that a plaintiff was not discharged because of his disability where his employer did not know about the plaintiff's insomnia when it made an employment decision about the plaintiff); Pace v. Paris Maintenance Co., 107 F. Supp. 2d 251, 262 (S.D.N.Y. 2000), aff'd, 7 F. App'x 94 (2d Cir. 2001) (finding that an employee did not suffer an adverse employment action because there was no evidence "to suggest that any of the Defendants knew of [the plaintiff's] record of past

---

[11]  This Court will not consider Pacenza's argument that "major depression" constitutes a disability within the meaning of the ADA because Pacenza did not allege in his Complaint that he suffered from "major depression."  (Cmplt., ¶ ¶ 7, 35, 37, 47, 49, 83)

alcoholism"); <u>Moore v. Time Warner GRC 9</u>, 18 F. Supp. 2d 257, 262 (W.D.N.Y. 1998)

("[m]ere knowledge that [the plaintiff] suffered from diabetes or hypertension is not

equivalent to knowing that his condition 'disabled' him within the meaning of the

ADA"); <u>Kolivas v. Credit Agricole</u>, No. 95 Civ. 5662, 1996 WL 684167, at *3 (S.D.N.Y.

Nov. 26, 1996), <u>aff'd</u>, 125 F.3d 844 (2d Cir. 1997) ("[a]t the very least, for there to be

causation, the employer must have knowledge of the disability").  <u>Cf.</u> <u>Barnett v. Revere</u>

<u>Smelting & Refining Corp.</u>, 67 F. Supp. 2d 378, 392 (S.D.N.Y. 1999) (finding a question

of fact as to whether plaintiff was fired because of his disability where it was unclear

whether the employer knew about the plaintiff's disability).

> **i.      Mihans's Knowledge of Pacenza's**
> **Alleged Internet Sex Addiction Did**
> **<u>Not Put Him on Notice of Pacenza's PTSD</u>**

Pacenza offers two pieces of evidence to show that Mihans knew about his

PTSD.  Pacenza first points to evidence that he told Mihans that he had a "long-standing

Internet sexual addiction" when Mihans initially warned him about his improper internet

usage.  (Pacenza Decl. ¶ 160)  Knowledge of Pacenza's alleged internet sex addiction

does not mean that Mihans was on notice of Pacenza's PTSD, however.  "Although there

may be close cases where knowledge of some symptoms may give rise to a question of

fact concerning the employer's knowledge of the claimed disability, this is not one of

them."  <u>Watson v. Arts & Entm't Television Network</u>, No. 04 Civ. 1932, 2008 WL

793596, at *14 (S.D.N.Y. Mar. 26, 2008) (internal citations omitted).  There is no reason

to believe that Mihans would assume Pacenza had PTSD merely because Pacenza

disclosed that he had a "long-standing Internet sexual addiction."[12]  Accordingly, Pacenza's disclosure of this alleged addiction did not put Mihans on notice of Pacenza's PTSD.

### ii.    Sieverding's Notes Do Not Demonstrate that Mihans Was on Notice of Pacenza's PTSD

Pacenza also alleges that Sieverding's notes of her May 29, 2003 meeting with Mihans indicate that she informed Mihans of Pacenza's PTSD.  These notes state that "Pacenza was treated in 1998 for a sexual disorder/psychiatric problems, and that therapy was indicated," but that "[t]here were no restrictions on record" – i.e., there were no restrictions on the type of work Pacenza could perform.  (Pacenza Ex. 9)  Based on these notes, Pacenza makes a series of assumptions that are not supported by any evidence.

First, Pacenza assumes that IBM's medical records concerning him reveal that he had PTSD.  There is no such evidence in the record.  (See id.)  Second, even if these records disclosed that he had PTSD, Pacenza has no proof that Sieverding accessed his medical records and thereby gained knowledge that he suffered from PTSD. Pacenza's claim on this point is mere speculation, because Sieverding testified that she did not and could not access Pacenza's medical records, and there is no contrary evidence.  (Sieverding Dep. 30:23-31:9)  Finally, Pacenza assumes that Sieverding shared Pacenza's medical information with Mihans, and that Mihans thereby learned of Pacenza's PTSD.  (Pacenza Br. at 21)  Once again, this is mere speculation, because

---

[12]  Pacenza does not argue that his alleged internet sex addiction constitutes a disability within the meaning of the ADA or the NYSHRL.  See 29 C.F.R. § 1630.3(d)(1) (explaining that a "disability" under the ADA does not include "[t]ransvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders").

Mihans testified that he had no knowledge that Pacenza suffered from PTSD and there is no evidence that Sieverding knew that Pacenza suffered from this disorder.

The Seventh Circuit confronted a somewhat similar factual scenario in Hedberg v. Indiana Bell Tele. Co., Inc., 47 F.3d 928 (7th Cir. 1995)  In Hedberg, the plaintiff told his supervisor that he might have a major health problem, and asked the supervisor not to tell anyone about this potential diagnosis.  See id. at 930.  About five weeks later, the employer decided to fire plaintiff.  See id.  The supervisor testified, however, that he did not tell anyone about the plaintiff's possible medical problem until after the employer made its decision to fire plaintiff.  See id.  Plaintiff argued that because his supervisor occasionally reported to the manager who decided to fire the plaintiff, it was reasonable to infer that the supervisor had told the manager about the plaintiff's illness.  Id. at  931.  The Court ruled that this argument was "unsupported speculation" because of the plaintiff's request for secrecy, the supervisor's sworn statement that he had honored that request, and the short period of time between the plaintiff's disclosure and the termination decision.  See id. at 932.

Pacenza's factual basis for arguing that the decision maker knew of his disability is much weaker than in Hedberg.  Here, there is (1) sworn testimony by Pacenza that he never told his supervisor of his disability (Pacenza Dep. at 76:14-18); (2) sworn testimony from Mihans, the supervisor (and decision maker) that he had no knowledge of Plaintiff's disability (Mihans Dep. at 8:16-21); (3) no evidence that the alleged conduit – Sieverding – knew that Pacenza had PTSD or discussed this with

Mihans[13]; and (4) there is no evidence that the underlying medical records Sieverding

denies accessing disclose that Pacenza had PTSD.

In sum, because Pacenza has presented no evidence that Mihans – the

decision maker for purposes of the termination of his employment – knew that he

suffered from PTSD, Pancenza cannot establish a <u>prima</u> <u>facie</u> case of disability

discrimination under the ADA.

### 3.    Pacenza Has Not Demonstrated that IBM's <u>Reason for His Discharge Was a Pretext</u>

Even if Pacenza were able to establish a <u>prima</u> <u>facie</u> case of disability

discrimination, IBM would still be entitled to summary judgment, because Pacenza has

not shown that IBM's reason for his termination is pretextual.  Once a plaintiff makes out

a <u>prima</u> <u>facie</u> case, "the burden of production then shifts to the defendant[,] who must

proffer a legitimate, non-discriminatory reason for its actions in order to rebut the

presumption of unlawful discrimination."  <u>Greenway v. Buffalo Hilton Hotel</u>, 143 F.3d

47, 52 (2d Cir. 1998).  Here, IBM has met its burden of production by offering evidence

that Mihans terminated Pacenza's employment because, after an earlier warning, Pacenza

accessed a sexually oriented chat room on his work computer, which violated IBM's

internet usage and harassment policies.

Because IBM has put forth a legitimate reason for Pacenza's termination,

the burden shifts back to Pacenza to "show that the proffered reason was merely a pretext

---

[13]   Indeed, Sieverding testified that neither Pacenza's "psychological problems" nor the fact that he is a "sex addict" was discussed in connection with Pacenza's termination. (Sieverding Dep. at 29:8-25)  Sieverding testified that all that was discussed was that Pacenza "had a problem with chat rooms and accessing pornography." (<u>Id.</u> at 29:23-24) Sieverding did not even know that Pacenza was a Vietnam veteran until after his termination.  (<u>Id.</u> at 30:2-8)

for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more." <u>Heyman v. Queens Village Comm. for Mental Health for Jamaica Cmty. Adolescent</u>, 198 F.3d 68, 72 (2d Cir. 1999) (quotation omitted).  A "fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable," but should instead "determin[e] whether the articulated purpose is the actual purpose for the challenged employment-related action." <u>DeMarco v. Holy Cross High Sch.</u>, 4 F.3d 166, 170-71 (2d Cir. 1993).  "The pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." <u>Id.</u> at 171.

a.     **Pacenza Has Not Shown That IBM's Proffered**
**<u>Reason for His Discharge Is False</u>**

i.     **IBM's Policies Prohibited the**
**<u>Conduct in Which Pacenza Engaged</u>**

To show that IBM's proffered reason for Pacenza's termination is a pretext, Pacenza offers a myriad of arguments.  Pacenza does not deny, however, that he committed the conduct that IBM alleges led to his termination; indeed, he states that he entered the chat room at issue seeking to engage in "adult conversation," which he hoped would be "titillating."  (Pacenza Decl., ¶¶ 116, 117)  Instead, Pacenza argues that he "was not given adequate warning of the prescribed conduct," because Mihans did not

specifically tell him that IBM prohibited accessing sexually oriented chat rooms at work. (Pacenza Br. at 4, 5, 20)

IBM's internet policies, however, clearly prohibited Pacenza's conduct. IBM's computer usage policy states that "of particular concern is the use of IBM assets to access sites others are likely to find offensive[,] such as Web sites with sexually explicit content. . . ."  (Lauri Aff., Ex. E)  IBM's harassment policy likewise prohibits "vulgar language" and "the display of sexually explicit or suggestive material" (id., Ex. F), and states that IBM "has a zero tolerance level for such conduct in the work environment." (Id.)  By entering a sexually oriented internet chat room, Pacenza violated these policies. Pacenza cannot and does not claim that he was unaware of these policies, because he attended sexual harassment training in 2002 (id., Ex. H), and he reviewed the BCGs in 2003. (Id., Ex. I)

Courts have held that violation of an employer's policies is a legitimate reason for an employee's termination.  See Shider v. Commc'ns Workers of Am., No. 95 Civ. 4908, 2004 WL 613093, at *6 (S.D.N.Y. Mar. 29, 2004), aff'd, 2005 WL 2650007 (2d Cir. 2005) (summary order) (finding no pretext where § 1981 plaintiff admitted that she violated her employer's written policy, and the employer presented evidence that similarly situated employees were fired); see also Jones v. Gov't Employees Ins. Co., No. 04 Civ. 3492, 2006 WL 1229136, at *7 (E.D.N.Y. May 8, 2006) (finding no pretext where ADA plaintiff had a long history of violating the employer's strict attendance policy and the plaintiff had been warned about his attendance violations in the past); Harris v. Franziska Rackers Ctrs., Inc., 340 F. Supp. 2d 225, 237 (N.D.N.Y. 2004) (finding that a Title VII plaintiff had not rebutted employer's legitimate non-

discriminatory reason for firing him where the employer believed that plaintiff had violated the employer's confidentiality policy).

Here, Pacenza admits that he logged onto a sexually oriented internet chat room seeking titillating adult conversation.  (Pacenza Decl. ¶¶ 116, 117)  He likewise admits that his supervisor had previously warned him about his internet use.  (Pacenza Dep. at 56:3-9)  Finally, IBM's policies clearly prohibit this conduct, and it is undisputed that Pacenza was aware of those policies.

### ii.    Pacenza Has Not Shown that IBM Treated Other Employees Who Committed Internet Violations Less Harshly

Pacenza claims that "[a] comparison between plaintiff's case and all the other individuals identified by IBM as fired for Internet related offenses reveals that Plaintiff was treated more harshly. . . ."  (Pacenza Br. at 20)  Intertwined with this argument is Pacenza's claim that there is a substantial difference between downloading pornographic photos and participating in a salacious chat room.  (Id. at 2)

"A plaintiff may establish pretextual termination 'by proving that similarly situated [non-disabled] employees were treated more favorably than he.'"  Ebanks v. St. Christopher-Ottilie, No. 98 Civ. 4777, 2000 WL 1364357, at *5 (E.D.N.Y. Sept. 5, 2000) (quoting Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 839 (2d Cir. 1996)).  "As the Second Circuit has explained, '[t]o be similarly situated, the individuals with whom [a plaintiff] attempts to compare h[im]self must be similarly situated in all material respects.'"  Id. (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)).

Even accepting <u>arguendo</u> Pacenza's strained claim that there is a significant difference between sexually explicit images and sexually explicit language, IBM has offered ample evidence that it fired other employees for computer misuse that was similar to Pacenza's conduct.  For example, it is undisputed that IBM fired three employees for sending out vulgar email and another for sending "an inappropriate sexual message on IBM's computer system."  (Lauri Aff., Ex. Z; IBM 56.1 Statement, ¶ ¶ 55, 56, 57)  In short, IBM has offered proof that it has terminated employees in the past who did no more than access or send vulgar or sexually oriented text.  Accordingly, Pacenza has not demonstrated, based on a disparate treatment argument, that IBM's proffered reason for his termination is a pretext.[14]

### b.    IBM Had a Good Faith Belief in Its Reason for Terminating Pacenza

Pacenza argues "there is no evidence that [he] wrote, or saw, any sexually descriptive words or vulgar expressions on the computer station where he had been

---

[14]  Pacenza also argues that his positive employment reviews, and IBM's treatment of his internal appeal, demonstrate that IBM was motivated by disability animus.  These arguments are frivolous.  Pacenza's good employment record has no bearing on whether he deliberately violated – after fair warning – IBM's internet policies.  With respect to the internal appeal, in order to make out a disparate treatment claim, Pacenza must present evidence as to how similarly situated employees were treated.  <u>See Divers v. Metro. Jewish Health Sys.</u>, No. 06 Civ. 6704, 2009 WL 103703, at *12 (E.D.N.Y. Jan. 14, 2009) (finding a Title VII plaintiff did not establish pretext because she did not show how an employer's transfer policy affected similarly situated employees); <u>Lewis v. City of Buffalo Police Dep't</u>, No. 02 Civ. 0735, 2007 WL 4191810, at *7 (W.D.N.Y. Nov. 21, 2007) ("Evidence of disparate treatment cannot be based on conclusory allegations.")  Here, Pacenza offered no evidence as to how IBM processed other employee's internal appeals, but simply made conclusory allegations that his "understanding was, and is, that IBM has a policy which grants all its employees fair treatment and the right to an appeal of unfair treatment."  (Pacenza Decl., ¶ 129)  At summary judgment, Pancenza must proffer admissible evidence demonstrating how IBM treated other employees in the appeal process.  He has not made such a showing, and accordingly has failed to demonstrate that IBM's denial of his internal appeal is evidence of pretext.

working," and that "the deposition testimony evidence of IBM's witnesses is clear: plaintiff left his computer, and thereafter the conversation continued 'streaming in' to the chat room in Plaintiff's absence."  (Pacenza Br. at 31)  As explained above, the prohibitions in IBM's policies are sufficiently broad to encompass logging into a sexually oriented chat room, even if an employee did not participate in the chat room conversation.  But even if the Court accepted Pacenza's argument, there is no evidence that Mihans acted unreasonably when he fired Pacenza, or that Mihans did not believe in good faith that Pacenza had violated IBM's internet policies.  In similar circumstances, courts have held that, in order to avoid a finding of pretext, an employer must merely have a good faith belief in the articulated reason for an employee's termination.  See Roge v. NYP Holdings, Inc., 257 F.3d 164, 169 (2d Cir. 2001) ("In such circumstances, it is common sense and entirely lawful for an employer to select for termination an employee who the employer in good faith believes recently engaged in fraud relating to the employment."); see also McPherson v. New York City Dep't of Ed., 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case, however, we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer.") (emphasis in original); Joy v. Kinplex Corp., No. 06 Civ. 1990, 2008 WL 1995370, at *7 (E.D.N.Y. May 6, 2008) ("The Court recognizes that the fact that an employee disagrees with an employer's reasons for termination, or even has evidence that the decision was objectively incorrect, does not demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."); Rodriguez v. City of New York, No. 05 Civ. 5117, 2008 WL 420015, at *13 (E.D.N.Y. Feb. 11, 2008) ("the fact that an employee disagrees with the results of an employer's decision regarding termination, or even has

evidence that the decision was objectively incorrect or was based on a faulty

investigation, does not automatically demonstrate, by itself, that the employer's proffered

reasons are a pretext for termination.")  Here, Pacenza has offered no evidence

demonstrating that Mihans did not have a good faith belief that Pacenza had violated

IBM's policies; indeed, all of the evidence is to the contrary.[15]

**c.      IBM Did Not Fail to Reasonably
        Accommodate Pacenza**

Finally, Pacenza argues that IBM should be held liable for disability

discrimination because it failed to make "reasonable accommodation" for "his perceived

Internet addiction."  (Pacenza Br. at 24)  Pacenza misunderstands the nature of a

reasonable accommodation.  The purpose of a reasonable accommodation is to allow a

disabled employee to "perform the essential functions of the job."  Rodal v. Anesthesia

Group of Onondaga, 369 F.3d 113, 118 (2d Cir. 2004).

Pacenza has stated throughout this litigation that he was able to perform

the essential functions of his job without any reasonable accommodation from IBM, and

---

[15]  Pacenza also argues that he is entitled to a "Price Waterhouse burden shift" because
Sieverding allegedly obtained access to his medical records.  Pacenza argues that the
"reasonable inference [from this alleged conduct] is that IBM officials were fishing for an
excuse to fire this older, psychologically-disabled worker."  According to Pacenza, this
case presents "classic 'mixed motive' discrimination."  (Pacenza Br. at 22)

As noted above, the necessary factual predicate for this argument is absent, because
there is no evidence that Sieverding accessed Pacenza's medical records.  Even if the
necessary factual predicate were present, Pacenza has not made the factual showing
necessary to warrant a Price Waterhouse burden shift.  "To warrant a mixed-motive
burden shift, the plaintiff must be able to produce a smoking gun or at least a thick cloud
of smoke to support his allegations of discriminatory treatment."  Sista, 445 F.3d at 74.
There is no such evidence here.  Indeed, the undisputed evidence is that Mihans,
Sieverding, and Meigel – the only IBM employees who discussed Pacenza's termination
– did not even know about Pacenza's PTSD prior to his termination.  (Mihans Dep. at
8:16-21; Meigel Dep. at 22:14-16; Sieverding Dep. at 29:16-25, 30:2-11)  Accordingly,
no such burden shift is appropriate.

that his access to the internet actually helped his job performance.  (Pacenza Decl. ¶¶ 63, 65, 66-68, 98, 99)  Pacenza cannot now claim that he needed a reasonable accommodation from IBM to perform the essential functions of his job.

*          *          *

In sum, IBM's motion for summary judgment concerning Pacenza's ADA and related NYSHRL claim is granted, because Pacenza has not established a <u>prima facie</u> case and has not shown that IBM's proffered reason for his termination is a pretext.[16]

## III.   Pacenza's ADEA Claim

### A.   ADEA Legal Framework

"The ADEA prohibits discrimination in employment on the basis of age against persons aged 40 or older."  <u>D'Cunha v. Genovese/Eckerd Corp.</u>, 479 F.3d 193, 194 (2d Cir. 2007).  Claims under the ADEA are governed by the same <u>McDonnell Douglas</u> burden-shifting analysis that applies in ADA cases.  <u>See</u> <u>id.</u>

To establish a <u>prima facie</u> case of age discrimination, a plaintiff must demonstrate:  (1) membership in a protected class; (2) qualification for his or her position; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.  <u>See</u> <u>Kassner v. 2nd Avenue Delicatessen Inc.</u>, 496 F.3d 229, 238 (2d Cir. 2007) (quoting <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 639

---

[16]  In his opposition brief, Pacenza argues that IBM violated the confidentiality provisions of the ADA and that it retaliated against him in violation of both the ADA and NYSHRL. (Pacenza Br. at 22-26)  Because these claims were raised for the first time in Pacenza's opposition papers, they will be disregarded.  <u>See</u> <u>Beckman v. United States Postal Serv.</u>, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ("Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment."); <u>see also</u> <u>Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.</u>, 468 F. Supp. 2d 489, 495-96 (W.D.N.Y. 2007).

30

(2d Cir. 2000)).  "The burden on the plaintiff of presenting a prima facie case under McDonnell Douglas is minimal."  Roge v. NYP Holdings, Inc., 257 F.3d 164, 168 (2d Cir. 2001) (quotation omitted).

### 1.      Pacenza Established a Prima Facie Case

Pacenza has made out a prima facie case of age discrimination:  he was fifty-four years old when fired; was clearly qualified for his job and had received positive employment reviews during his nineteen years of employment; and he clearly suffered an adverse employment action when IBM terminated his employment.  The circumstances of his termination also support an inference of discrimination, because Pacenza alleges that his duties were assumed by other Tool operators and temporary employees, many of whom were in their early twenties.  (Pacenza Decl. ¶¶ 157, 158)  Although IBM has offered evidence that co-workers who took over Pacenza's job "included individuals who were in the same age group as Plaintiff" (IBM R. 56.1 Statement, ¶ 29), this evidence does not rebut Pacenza's assertion that the majority of people who took over his job were far younger than him.  (Pacenza Decl. ¶ 158)  In similar cases, courts have found that such circumstances support an inference of discrimination.  See D'Cunha, 479 F.3d at 195 (finding an ADEA plaintiff established a prima facie case of age discrimination when a potential employer offered a position that the plaintiff applied for to someone eight years younger than the plaintiff); Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 102 (2d Cir. 2001) (finding a plaintiff established a prima facie case because the plaintiff was a qualified, sixty-two year old applicant and the job he applied for was awarded to a forty-two year old applicant).

## 2.    Pacenza Has Not Shown That IBM's Reason
for His Termination Was a Pretext

Because Pacenza has established a <u>prima facie</u> case of age discrimination,

the burden shifts to IBM to provide a non-discriminatory reason for Pacenza's

termination.  IBM meets its burden by offering evidence that it fired Pacenza because he

logged into a chat room containing inappropriate content, thereby violating IBM's

policies.

Once a defendant comes forward with a nondiscriminatory reason, "the

presumption of discrimination drops out of the case, and the plaintiff must prove that a

defendant's proffered reasons were not the true reasons for its actions but a pretext for

discrimination."  <u>Cross v. New York City Transit Auth.</u>, 417 F.3d 241, 248 (2d Cir. 2005)

(quotation omitted).  In other words, a plaintiff must show that the employer's "proffered

reason was not the true reason for the employment decision and that the plaintiff's

membership in a protected class was."  <u>Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.</u>,

No. 06 Civ. 5474, 2008 WL 857492, at *5 (S.D.N.Y. Mar. 31, 2008) (citing <u>Texas Dep't</u>

<u>of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 254-56 (1981)).

To support his ADEA claim, Pacenza raises the same arguments he used

to support his ADA claim.  These arguments fail largely for the same reasons discussed

above:  Pacenza has failed to show that his conduct did not violate IBM policies or that

IBM treated similarly situated employees differently.

Additionally, Pacenza has presented no evidence that would permit a jury

to find that IBM fired him because of his age.  Pacenza testified that neither Mihans nor

Miegel ever made any comments or did anything that led him to believe that they were

"looking to get rid of" Pacenza because of his age.  (Pacenza Dep. 93:13-24)  In fact,

Pacenza testified that no one at IBM ever made any comments or did anything that led him to believe that IBM was discriminating against him because of his age.  (Id. at 93:25-94:8)

Pacenza offers two pieces of evidence to support his claim that IBM fired him because of his age.  First, Pacenza argues that age animus motivated Questal to report Pacenza's chat room use to Mihans.  (Pacenza Br. at 13)  Although Questal was twenty-five years younger than Pacenza, Pacenza has offered no evidence that Questal disliked Pacenza because of his age.

Second, Pacenza refers to the fact that younger employees took over his position as Tool operator. (Pacenza Br. at 12)  Courts routinely hold that the mere fact that a younger employee replaces a plaintiff or is hired instead of the plaintiff does not establish pretext.  See Milano v. Astrue, No. 05 Civ. 6527, 2008 WL 4410131, at *32 (S.D.N.Y. Sept. 26, 2008) ("While the fact that each applicant was younger than [the plaintiff] at the time of selection is sufficient to sustain Plaintiff's de minimis burden of establishing a prima facie case, it is not sufficient to undermine the [employer's] asserted non-discriminatory and non-retaliatory reasons for its selection of applicants other than Plaintiff."); Peres v. Oceanside Union Free Sch. Dist., 05 Civ. 1807, 2008 WL 305342, at *12 (E.D.N.Y. Jan. 31, 2008) (finding that a plaintiff did not establish pretext because "other than the fact that Plaintiff was replaced by a younger worker, Plaintiff offers no other evidence which would bolster her prima facie case or demonstrate pretext.")

Because Pacenza has failed to offer evidence demonstrating that IBM's proffered reason for his termination is a pretext, and that Pacenza's age is the true reason

for his termination, the Court grants IBM summary judgment on Pacenza's ADEA and

related NYSHRL claim.

## CONCLUSION

For the foregoing reasons, IBM's motion for summary judgment is

GRANTED and Pacenza's motion for partial summary judgment is DENIED. The Clerk

of the Court is directed to terminate the motions [Docket No. 17] and to close this case.

Dated: New York, New York
April 1, 2009

SO ORDERED.

Paul G. Gardephe
United States District Judge